Thank you, your honors. May it please the court. In the time that I have here, I'm going to address a pair of tandem issues that considered separately, individually or together, merit relief. At the core of any case is the criminal defendant's right to due process and a fair trial. In this situation, those rights were violated by a failure to sever and by a series of evidentiary admissions that resulted in Mr. Anderson being subjected to repeated inferences regarding testimony and evidence pertaining to certain witnesses in the case that had actually nothing to do with him. Although references to organized crime and the mafia were kept out, there were repeated references to witnesses from this world. And if you read the record, you can see that the references to this world are a veiled way of referring to the underworld. And these witnesses who came in had testimony that was directly relevant to the co-defendants but had no relevance whatsoever to Mr. Anderson. This goes to what we contend is the misleading of the jury, causing an issue with the inability to fairly separate the evidence, compartmentalize the evidence. Your honors, there was some fairly lurid and graphic testimony even from a Jennifer Sorrentino, a witness revealed not too long before trial. And in closing, there were references to compare the world of the Herford House witnesses with witnesses from the world of Mark Sorrentino and Vince Pichotta. The defense witnesses look at these same pictures and say, too dark, too grainy, I can't tell. Well, two witnesses not from the world of Mark Sorrentino and Vince Pichotta, they came in here, Jeremy Skaggs and Shane Colt, and they had the courage to say that's Vince Pichotta. These repeated references to the world unfairly and improperly imported the issue we contend of organized crime into this case and improperly smeared Mr. Anderson with it. Your honors, there should have been a severance granted in the case because of the likelihood of extreme and unfair prejudice, confusion of the issues, misleading of the jury. Your honors, on a related note, in terms of... Ms. Bywood, was there objection to using the term their world, that sort of thing? There was not an objection during that portion of the closing, but there were repeated, and I stress repeated, requests for severance that were raised pre-trial in the papers, that were raised just as the trial was starting, and that were reasserted throughout trial for this very reason. The difficulty any jury would have compartmentalizing the issues, separating what evidence pertained to which defendant, and such lurid testimony, lurid and prejudicial, would have the effect of smearing everybody, frankly, sitting at the So, we have on one hand, the failure to grant a severance. On the other, we have the series of evidentiary errors, the most prominent of which is the admission of the statement from Mr. Anderson's bankruptcy exam, quote, sometimes you do crazy things. That statement was made in response to a question about him infusing some of his own money into the business, yet presented alone as a stand-alone loop on a tape, had the effect of presenting it almost as an admission. It had no relevance to the criminal acts charged in this case, and yet, you know, it resonated again throughout the trial as almost a kind of theme. The crazy things was referenced in the opening, and again in the closing, and anticipating your question, yes, it was objected to as an evidentiary item. Actually, that's close to the question I was thinking of, but not exactly. The question I was thinking of is, were you able to set the correct context? What, who do you mean, was able to set the correct context? The trial counsel was for Mr. Anderson. Was he or she able to set the correct context in which that statement was made? Your Honor, the fact that it came from a bankruptcy proceeding, that was indeed mentioned. But the way the tape itself was presented, and the way it was argued, particularly in the closing, suggested that it had something to do with the acts charged in this case. And indeed, it almost invites the jury to engage in improper propensity reasoning. Because he did a crazy thing here, well, certainly he did this crazy thing here, and they're all related to the problems that he has. But wouldn't Mr. Anderson's counsel be able to show that that was, in fact, in response to a question about why you didn't, why he put money in, and then you could argue that that's, that the response had nothing to do with an arson. It was why he was putting money in. Your Honor, in fact, the comment or testimony in the tape, that whole series of things was objected to. Trial counsel made a very forceful objection, in fact. But I think most trial counsel would agree, once something like that has happened, you don't want to turn around and draw more attention to it. I mean, it's already caused prejudice. And I think the jury was aware it came from a debtor's exam. But the question would naturally arise, why is the government presenting it? What does this have to do with this case? Of course, it must have something to do with what he is charged with doing here. And I am about out of time. I'm going to try and save 30 seconds for rebuttals. I'm not going to hold this against you, but I'll ask you this question. I'll save your time. Sure. In the perfect world, what's your solution? What is the thing that really went wrong here in your view, in this case? Well, we make a very strong cumulative error argument, Your Honor. And in a case where intent is the essence of the defense, in terms of no intent to enter into an agreement with this person on the tape, there was no agreement entered. So when you have issues of knowledge and intent that are at the center of the case, and then you present this tape, sometimes you do crazy things, and then you have these individuals brought in whose very presence and the way they are questioned and referred to suggests they are from the underworld, causes immense prejudice, Your Honor. Thank you. Thank you. We will next hear from Mr. Vincent Biscotta. I do support counsel Robin Fowler on behalf of Mr. Bishoda. I was not the trial attorney. I'd like to mention that. And that's pronounced Bishoda. It is, Your Honor. Okay. Thank you. And what I would like to do in the time I have is address the double jeopardy argument. Counsel for Mr. Sorrentino will address some of the other areas that we have that are related. And I think the key point that I would like to make here today, and as I reread some of these cases, it seems like I get more confused as opposed to the opposite, but Mr. Bishoda received 60 months on the conspiracy count, 120 on the arson, and then a consecutive 120 on the use of fire. The argument that I would like to make today is that 60 months have to come off as double jeopardy. It's a much tougher sell to say that there cannot be a conspiracy to commit arson and then a subsequent use of fire in connection with that felony. I think that's a much more difficult argument to make. It's made by my colleague in his brief. What's your argument on the 60 months? My double jeopardy argument goes to the arson primarily today. That is the successive punishment, the double jeopardy issue that Mr. Bishoda has. I think it's a tougher sell to say we couldn't... Because he was convicted of arson and conspiracy? To commit arson, yes, but not to commit mail fraud. The jury... But then the use of fire, 10 year, was on top of those two. That's correct. So essentially we have a... What's the problem if the 10 years is okay as to the conspiracy? Why can't you have the arson and the conspiracy? We received a sentence of 240 months. The conspiracy is capped at 60, so if the arson is double jeopardy to punish for arson and the use of fire in connection with the conspiracy which we're charged with, 60 months come off the sentence. I'm probably not saying that very clearly. I'm still not tracking you because I thought you said if we accept that the use of fire is okay on top of the conspiracy... Correct. You didn't get any extra time, did he, for use of fire on top of the arson? Yes. We got an extra 60 months because the conspiracy is capped at a 5 year, 60 month penalty. We got 120 months on the arson, so the consecutive time starts at the end of the arson penalty. So essentially we're being punished an extra 60 months for that arson conviction. So there is absolutely multiple punishment for what I would argue is the exact same offense. Count two and count four. I'm sorry, which two offenses are you saying are the same offense here? I'm confused. I think collectively it's all three of them, and I think that's what the cases suggest. The Corona case and I think the Konopka case. The Corona case, the Fifth Circuit says you cannot be punished for all three of these offenses. You could be punished for two of them, but not all three. Count two, the arson offense, and count three or count four, the use of fire and connection, are charged on the same date. Count two incorporates the first 11 paragraphs of the conspiracy. Those paragraphs include the overt acts that allege a fire occurred. See, I thought the argument was that you couldn't charge both the arson and the additional 10 years for the use of fire, that that was double jeopardy. Now you seem to be saying that it's the 60-month conspiracy charge. No, Your Honor. Your first argument is correct. The practical effect of it would be shaving 60 months off the sentence because we'd still have the conspiracy count. But you don't object to being convicted of both arson and conspiracy to commit arson on double jeopardy grounds, do you, setting aside the enhancement? That, in my— 60 plus 120 is okay, running concurrent. Using okay loosely, right. It's constitutional. I'm not challenging that on behalf of Mr. Pasciotta. So what's the problem then with adding 120 on top of those two for use of fire in connection with the conspiracy? Because that's double punishment for the same offense. Conspiracy and arson, to me, are clearly different. Offenses under Blockberger, any other test you want to give it. When you look at the use of a fire, it's the exact same date as count two, the arson. No, I'm talking about the use of fire and the conspiracy. Why don't we look at it that way and say you just got the enhancement as to the conspiracy? Because if that was all we got, we'd have 180 months instead of 240. No, well, that's if you weren't convicted of arson, but he was also convicted of arson. He just gets the 60 months for arson without the enhanced 844 age. But that's the double, that's the successive punishment. It's not double jeopardy, I would allege, for the conspiracy and the use of fire. But when it's use conspiracy to commit arson and arson incorporating those same acts and use in furtherance, then that's- for use of fire be the conspiracy rather than necessarily the arson in this case? I don't think that it could be. And the cases discuss that. I mean, there is a split in the circuits between how they view it. Some of the circuits say, for example, Cheney in the Seventh Circuit says arson and use of fire is the same offense. The Corona case says- Do any of them deal with conspiracy? I don't think the Cheney case doesn't have a conspiracy- the case I cited doesn't have a conspiracy element in there or charge in there. And I apologize, I see my time's up. All right, thank you very much, Mr. Powell. We will next hear from Mr. Trey Petlin. Petlin, all right. Thank you. May it please the Court, counsel, Mark Sorrentino appears by his attorney, Trey Petlin. Your Honors, my hope is to talk a little bit about a couple issues, one being my argument that the defendant should have been allowed to cross-examine Jennifer Sorrentino about intentionally ramming defendant Sorrentino's car into his car to show bias. This cross-examination, I would submit, would have significantly altered the impression of the jury about the single most important witness for the government, a witness, I would submit, that without whom they could not have convicted defendant Sorrentino and perhaps defendant Peixota. Ms. Sorrentino testified about two critical points in the case. One, she testified that the larger suspect in the surveillance video was the defendant Sorrentino and she also identified Vince Peixota in that video. Secondly, she told an unforgettable story about defendants Sorrentino and Peixota and their misadventures on the night of the fire. Jennifer Sorrentino's testimony regarding identification of the suspects from the video was critical to the government's case. The suspects could not be identified from the surveillance video. In fact, the video alone would have resulted in a real possibility for misidentification. Suspect 2 in the video is simply a very large man with a similar body shape to Mark Sorrentino. Jurors were asked to compare the defendant's body type to suspect 2 in the video. The images of suspect 2 are black and white. They were taken through dark bubble lenses with the lights off in the restaurant and no ambient light except for flashlights. Suspect 2's body was covered almost completely and he had a hat to cover his head and face. And the government knew the limitations of the surveillance video. Special Agent Roberts tried to get a specialist to improve the quality of the video and he could not. Not a single person came forward to claim that suspect 2 was the defendant Sorrentino from the still images that were published except Jennifer Sorrentino, his ex-wife. They needed Jennifer Sorrentino to prove their case. The government didn't even seek an indictment in this case of defendants Sorrentino and Peixota until after Jennifer Sorrentino came forward. Even as of the time of trial, no one else who knew defendant Sorrentino even claimed to be able to identify him in the video. The government asked their case agent to help the jury with a lay opinion about who the shadowy figures were in the video. Others who testified in court indicated either that they could not identify the defendant Sorrentino or that they did not believe it was him despite knowing him personally. And even to this day, the third suspect in the surveillance video who appears in both the videos with suspect 2 has never been identified. With no facial details, this case is ripe for misidentification. Why don't you focus on why you think there was error on the cross-examination. I think the judge said you already established that she was biased and this would be, I guess he was saying cumulative or unfairly prejudicial or cause confusion because it's a collateral matter and so forth. What do you say to that? First of all, I would submit that the car ramming incident was significant and there was no other means of conveying that sentiment to the jury. It's one thing to be able to say to the jury the witness got in a heated divorce with the defendant. It's another thing entirely to say that she rammed his car intentionally, backed it up and rammed it again. It illustrates a level of hate and anger that could not be conveyed to the jury. It was critical evidence to expose the jury to so that they could understand why she might come forward with this elaborate story. What would have been the evidence about this ramming incident? What led to it happening? At or near the time that she started cooperating with investigators in this case, the evidence would have been that my client's car was parked outside of a business. She was seen driving. She gained speed. She hit his car. She backed up. She rammed his car again, and she did that repeatedly. That would have been the evidence. You mean she just drove up from somewhere else in town and there wasn't any contact between the two of them right before it happened? That's right. It would have been just simply that it was a deliberate act, violent, self-destructive, and aimed at the defendant. It's precisely the kind of evidence, Judge, I would submit, that would significantly alter a jury's impression of a witness's credibility. It exposes bias, and it illustrates why she would have come forward. Nevertheless, the court in this case prohibited all inquiry into this event, and for that reason, I would submit, it's not harmless error. Do you have anything you want to say about the new trial motion? Yes, very briefly, of course. I'd be interested in your thoughts on the judge's rationale about why he didn't meet the standard. Obviously, I disagree. But the cell phone records, which were exculpatory in nature, they contained a phone call that was made at 2.12 a.m. on the night of the fire. I think we know that, but the key is why did you meet the standards under Rule 33? The judge said it wasn't new, it was cumulative, and so forth. There was no other evidence which would have suggested that Jennifer Sorrentino was not at home. The players' card records, her casino players' card records, suggested that she was possibly playing slot machines all night when she claimed all of these pivotal things occurred that night. That was eyewitness testimony, incidentally, that was not available through any other means. And she, of course, after a break in the jury trial, came back and she said that she must have lent her players' card to someone else. The phone call illustrates that it's a phone call from her home to her cell phone. What about the court saying this was not new, that it was known to the defendant? How could he possibly know about it? She didn't know about it. I thought his testimony was that he called her. After he reviewed the phone records, which were revealed weeks later, we, number one, didn't know and had no way to know that there would be a need to prove her whereabouts on the night of the fire. The government indicated even prior to my opening statement that their surprise witness, when I asked for it possibly to be identified prior to opening statement, the government advised that the substance of their testimony would be for identification. So we had no idea. So now my client's got to go back four years and think about, number one, did he make a phone call that night? And number two, if he did, would the phone records still exist? He had no reason to know that. Ms. Sorrentino, who claimed to remember that night very well because it was her birthday, didn't remember the phone call. She claimed there were no phone calls from the defendant to her that night. So I would submit that until we got the records weeks after the trial, I could not have advised the court that it existed, and my client certainly wouldn't have had any reason to know it existed. His memory was refreshed once we saw the records. Thank you very much. Very well, Mr. Petlin. We will next hear from the government. My name is Jess Michelson, and I'm an Assistant United States Attorney in the Western District of Missouri. I, along with Assistant United States Attorney Paul Becker, were the trial counsel in this case. I first want to make sure I thank you all for accommodating us on rescheduling this hearing, which was originally scheduled for the last docket in September. It was very much appreciated. I also want to, for organization purposes, submit some of the arguments on the briefs, given the fact that they weren't addressed in the opening arguments by defense counsel here. The first one, I don't believe that Mr. Anderson addressed the sufficiency of the evidence, so we'd submit that on the briefs. I think our briefs are fairly brief. I don't think you need to list the ones you're going to submit on the briefs, because we have the briefs. You could just argue the ones you want to argue. All right. Speaking for myself, I don't know if you want him to list all the ones he's not going to argue. We will sort through that. All right. Thank you, Your Honor. I just wanted to make sure that I don't get anything on rebuttal on some of those issues that I didn't have a chance to address. First, I'll deal with, in the order that they were taken up here, then Mr. Anderson's motion for severance, and that's what the issue is here. He filed a motion to sever based upon antagonistic defenses. That's the issue he preserved. I actually didn't even hear defense counsel mention anything about antagonistic defenses during her oral argument here. She has now addressed only some spillover evidence that wasn't objected to by the trial counsel, and Mr. Anderson was represented by experienced and a very well-known trial counsel, Mr. J.R. Hobbs. Mr. Hobbs nor Mr. Peixota's counsel or Mr. Sorrentino's counsel objected to any of the information now that she's alleging regarding the closing arguments and references to the world. And before you isn't any issue with prosecutorial misconduct or any issues with the closing argument. Before you is only the denial of the motion to sever, which on the grounds of antagonistic defenses, clearly these defenses were not. The jury clearly could have believed Mr. Anderson's defense of, I was on this video and I met with the man, a man who he never identified, but of course the government argued was Mr. Peixota, and he didn't intend during the course of that meeting to have the purpose of whatever that meeting be arson or insurance fraud. That was Mr. Anderson's defense. Mr. Peixota and Mr. Sorrentino's defense simply was it wasn't them in the video. It wasn't them that committed the arson. These defenses were not antagonistic. Regarding the spillover effect here, Mr. Anderson's trial counsel and nor any defense counsel objected to these claims of argument on references to the world. And as Ms. Pilot pointed out, these references to the world in the statement that she acknowledged it, there were references to the Herford House employees. There was eight Herford House employees that testified, and during the course of their testimony about different events, they were shown the surveillance video, and they all without hesitation identified Mr. Anderson. Mr. Peixota and Mr. Sorrentino's defense witnesses, obviously they got up and they didn't identify Mr. Sorrentino or Mr. Peixota obviously in the Herford House surveillance video, but when then shown known photographs and known surveillance video from behind Mr. Peixota's own residence, several of them were hesitant and reluctant to even identify Mr. Peixota or Mr. Sorrentino in those events. And so these comments during closing argument was a reference about the credibility of the witnesses and the fact that some witnesses obviously without hesitation are willing to identify with others or not. But for the most part, when the court's analyzing that issue, Mr. Anderson waived anything about that regards. He forfeited it. He didn't object. He didn't even raise it again in his motion for new trial. It's the first time here on appeal that he actually raises these issues, and I would argue that as we cited that this court should deem those issues waived and not exercise their discretionary ability here to grant plein air review. You wouldn't mind taking them out of order a little bit. But I'd like to hear what you have to say about Jennifer Sorrentino, because the defense presents this as more or less a surprise witness. You had an order apparently that you didn't have to disclose her in advance. They had bias evidence that the judge kept out, and then they had the phone records that came in later that they say would have corroborated their defense that she couldn't have been home because she was at the casino with her playing card and now getting a phone call. Certainly, Your Honor. I'd be interested in your reaction to that. First, on the limitation of the cross-examination of Ms. Sorrentino on this car-ramming incident, first, there was never a formal offer of proof made before the district court, Chief Judge Greg Case. There was, again, just comments, as Mr. Petlons made here, about what this incident would have been. Well, the business it was, it was 2 o'clock in the morning outside of a strip club when Ms. Sorrentino, who was in the middle of a divorce, encounters her husband. So that gives you a little more context. As far as actual evidence, I think that the district court was clearly within its sound discretion to exercise reasonable limits in this case because, as Chief Judge Case said, there was clearly evidence of bias that was established already with Ms. Sorrentino that we didn't need to keep going down that road, engage in another trial within a trial on this. Why did she ram the car? What was he doing before that? What had happened and who's blaming who and what the intent of that? Because, as we cited in our brief, there were some specific examples already in which the defendants were able to establish Ms. Sorrentino was biased. One very specific reference to the transcript, there was testimony that she was very angry about the divorce. There was also testimony that she blamed the defendant for the foreclosure of their home. There was also testimony that she would say anything and she was on a mission to ruin the defendant's life. The defendant's own mother testified and described their breakup as mean and vindictive. I think as the trial court was able to, in this situation, exercise reasonable limits, that bias was clearly established in this regard, and there was no additional bias that would have been established by getting into this car-ramming episode. Additionally, the district court also excluded the evidence on grounds of Rule 608, given the fact that this evidence of bad acts of the witness had nothing to do with her propensity for truthfulness or untruthfulness. It clearly was something unrelated, related to the divorce. With regards to moving into this new trial motion, as the district court actually found and stated in its order regarding the defendant's motion for new trial, the district court found that the government produced sufficient evidence that a reasonable juror could reject all of Ms. Sorrentino's testimony and still find defendants guilty beyond a reasonable doubt. Was that the right standard, that there would have been sufficient evidence? Well, I was merely pointing that out, given the fact that that's what the judge found with the evidence with regards to excluding Ms. Sorrentino's testimony, with regards to the specific four elements that the defendants required to prove on the newly discovered evidence. First, there really are two things here. There's the defendant's affidavit. Now, the defendant exercised his right at trial to refuse to testify, and he did not testify. The defendant then, in support of his motion for new trial, submits an affidavit. The affidavit is really the important thing here for the defense, because the affidavit is what actually gives some context to these phone records. In Mr. Sorrentino's affidavit, he says, when he returned home, Ms. Sorrentino wasn't there, and so he called her from her home phone. Then you have these phone records, which weren't admitted into evidence, and we don't have before us, but I have seen them, obviously, and they're just simply toll records. They're not cell site location records. They don't tell us where the phone was. They're not intercepted phone calls. They don't tell us who was making any phone calls or receiving any phone calls. They're merely ---- But they support an inference that she was not at the home. But they support the inference if you ---- Strongly support that inference, because otherwise, why would the home phone call the cell phone? Well, the phone number, actually, which was apparently in someone else's name, it wasn't in her phone, so it's the defendant's testimony that it was her phone. Now, obviously, they could have crossed-examined her if they had the records. You mean you think it was not her phone? I'm not saying that, Your Honor, but I'm saying the phone records taken on their own, without Mr. Sorrentino's affidavit, are relatively meaningless, because it's Mr. Sorrentino's affidavit that actually explains the relevance of this call, and Mr. Sorrentino wouldn't even testify at any hearing on a new trial in this case. But going to that analysis, then, obviously, it wasn't newly discovered evidence, either the affidavit or the phone records. This evidence was inexistent at the time of the trial. The defendant clearly had within his knowledge the ability to remember what happened on that evening or not remember what happened on that evening. Well. There, as to the second one, the diligence in exercising and recovering these phone records. The defendant's arguments made that it was recognized a couple weeks after the trial. This was the records were not obtained by defense counsel until July. The trial was in October. So we're talking now over seven months later they actually get the phone records. So there's still, there has to be diligence at the time of trial. There wasn't any request to delay the trial to obtain the phone records. There wasn't any request to, there was no request made to actually subpoena the phone records. Well, how long did they have between the time they found out that she was going to testify and the time that she actually testified? There's evidence obviously the defendant endorsed witnesses, these bad acts witnesses for this car ramming episode were endorsed prior to trial. So they argue that this was a surprise witness. That wasn't, well, go ahead. However, I believe that they had, they were prepared prior to trial. And then on, according to the court's protective order, on October the 22nd was when the government disclosed to counsel who the witness was and turned over all the Jinx Act material at that time. And that was on Monday. On Tuesday, we elicited through direct testimony from another witness that Ms. Sorrentino was the one that came forward and identified. On Wednesday, that was another day that passed, she then testifies on Thursday. On Thursday, Mr. Sorrentino's counsel acknowledged to the court at that time that he didn't even look at the records when they were turned over to him on Monday night and that he didn't look at them until Tuesday night. So now we have her testimony on Thursday. They were able to subpoena the casino records and get the casino records at the time of trial. There was no request to delay to allow them to present it in their case. The case wasn't submitted until Monday the 30th. And there was no request to reopen or further submit the evidence. So it clearly… So they basically had a week. Basically a week from the time that the first information… Is that sufficient to get phone records? While a trial is going on. While a trial is going on, I'm certain if the court would order delay, there are exigent circumstances within which you can get phone records from companies. But in this case, how can it be said that it's diligent when there's not even an attempt made? In this case, there was… And the attempt then ultimately isn't made until July, almost eight months. I'll get my math right here. About nine months after the actual trial itself. But going through the further factors, also important is number three. The third factor, which the evidence cannot be cumulative or impeachment. And in this case, it's both. It was merely impeachment of Ms. Sorrentino, and it was cumulative already to the other evidence that they had with which they cross-examined her. How can it be cumulative? You mean the card that showed… Correct, correct. They already had evidence that she… The phone records would tend to show that if it's her phone that… Well, again, to that regard, we don't know what she would have said because she was never asked. The phone records weren't there. Mr. Sorrentino didn't want to testify and provide the information. So either he wasn't diligent in providing that information to his counsel, with which his counsel could do something with it, or they just decided they were going to wait until after trial. But on both points, I believe it was cumulative impeachment evidence in this case. And under the Huggins and this Court prior decisions, cumulative or impeachment evidence is not sufficient for a new trial motion, and cumulative impeachment evidence certainly would not be sufficient. With regards to the fourth factor, there has to be some materiality with regards to the defendant's guilt. In this case, I don't think there was material. The phone records themselves were nothing more than impeachment. The testimony with which Mr. Sorrentino submitted in the affidavit, if you consider that, that might have been material, but you can't consider the two of them together because Mr. Sorrentino chose not to testify. He chose not to subject himself to cross-examination or any kind of credibility determination. He merely submitted something eight months or more later in an affidavit that would not be subject to cross-examination. And then, obviously, the fifth requirement is that the evidence must not be— the evidence in this case was not likely to produce an acquittal if retrialed. And that's, I guess, where it goes to the District Court Chief Judge Kaye's statement that the government produced sufficient evidence that a reasonable juror could reject all of Mr. Sorrentino's testimony and still find the defendants guilty beyond a reasonable doubt. Mr. Michaels. What did he say on that last point? He said it's a District Court docket 211. But, I mean, was that his answer to the fourth prong? I think that was his conclusion in the end. His answer to the fifth prong was correct. It was that the evidence, if used at trial, would not have produced an acquittal or was not likely to have produced an acquittal. That's a different statement. That was a different statement, and then his final conclusion was— it doesn't speak to whether it was likely to result in a conviction. Correct. That was his conclusion after analyzing the five factors in his order. He also made mention again, obviously, regarding the strength of the evidence at the time of the defendant's sentencings and the fact that he reviewed the video himself and that he believed he saw the defendants in that video. Would you address the Picciotto and Sorrentino double jeopardy question? Yes. Basically, would you be asking us to create a circuit split with the Fifth Circuit if we ruled your way? Your Honor, I believe all I'm asking you to do is follow this circuit's law already in Eimhold and Shriver. This Court has already held, now that Mr. Picciotto has focused in his analysis here and said that the only thing he has a problem with is sentencing it consecutive to the arson, sentencing the use of fire consecutive to the arson. That seems to be the only issue he has. Wait a minute. Didn't Eimhold involve a mail fraud count as well? Correct. But in Eimhold, the Court also upheld the use of consecutive sentencing. One of the other underlying convictions was arson, and the use of fire was to commit mail fraud. But this Court held that the use of fire to commit mail fraud could be sentenced consecutive to an arson. Well, you have essentially two arsons in that case. It's the same analysis. But before we even get to that analysis, we have to look at legislative intent, and that's why the Eighth Circuit is different than the Fifth Circuit and the Seventh Circuit and the other cases that they've tried to get you to follow, because those circuits never followed Missouri v. Hunter. They never looked at the legislative intent. They summarily concluded because of, I guess, some fairness or because, as the defense analyzed it here, well, it just looks wrong. So is that a yes to Judge Render's question, that you are asking us to create a conflict with the Fifth Circuit? I don't believe there's a conflict. To the extent there's a conflict, there's already a conflict with the Fifth Circuit with the Eimhold and the Shriver decisions, because Eimhold and Shriver both clearly said legislative intent in enacting this statute and the use of any felony that they intended it to be imposed consecutive to any felony. And with regards to the Fifth Circuit, obviously I think in our brief I've cited there are several cases that follow the Corona decision where the Fifth Circuit itself, some of the panels have said that we, if they were riding on a clean slate, they acknowledged that essentially Corona had failed to do the Missouri v. Hunter analysis of legislative intent. And in the Severance case, the Fifth Circuit acknowledged the failure of Corona and basically stated that if they were riding on a clean slate, they may have decided differently today. However, they were bound by the prior panel. It does seem, when you talk about congressional intent, it does seem a little odd that Congress would define arson and set a punishment for it, arson of which obviously includes use of fire, and then in the very next paragraph say any felony offense that involves the use of fire gets 10 more. I mean, I can see an argument that says that it's less than clear that go ahead. If I may, Your Honor, the language they use is any felony. There are no exceptions to that statute. And then it goes further. It actually even broadens it. In the second paragraph, it says even any felony used. I'm going to miss the language if I don't quote it here. I apologize. The problem is inherent in the arson itself or the conspiracy to commit arson is, of course, the use of fire. Well, you're getting into the next step. You're conducting the Blockburger analysis here where I believe, because you're saying legislative intent isn't clear, so you want to then look at the elements, which is exactly what this Court in Eimhold and Shriver didn't do, but was the issue in Corona and Chaney and the other circuits. That's what they did. It doesn't sound fair, but if you look to the same analysis here, essentially a conspiracy and any kind of other underlying or substantive offense, the substantive offense is always subsumed usually by the conspiracy. Or many times with a 924C count that the Court probably sees more often, the 924C subsumes usually the drug trafficking offense or the violent crime, essentially, because it's a predicate offense. In this case, looking back to the charges here, what was charged was a use of fire in furtherance of the commission of a conspiracy to commit arson. There are actually separate elements of the statute if you did a Blockburger, which I'm asking you not to do because I think this Court's already said legislative intent is clear. But if you were to do a Blockburger analysis, I believe the conspiracy requires a proof of an agreement, which the use of fire in furtherance of a felony does not, where the use of fire in furtherance of a felony requires this nexus between the use of fire and this other felony, which you can commit a conspiracy to commit arson without ever having committed an actual arson and using fire. Do Cheney or Corona or any of the other circuit cases involve conspiracy to commit arson? There's a Fifth Circuit, and there were so many of them, Judge, I apologize. I don't remember which ones do involve. There were some conspiracies. Corona, I believe, said that they didn't think the conspiracy to commit arson would be okay, but there actually was another Fifth Circuit case, U.S. v. Riggio, that already said that that was okay. What do you mean it was okay? They actually did a Blockburger analysis, and I see my time's up. May I have a few minutes to answer your question? You may. I don't think it would take a few minutes. I just want to know what you say. They said it was okay. You mean they said in Riggio that it was proper to add the 10 years on top of a conspiracy to commit arson? I don't recall on that particular point. What they did do was a Blockburger analysis, finding there were separate elements between a conspiracy to commit arson and the use of fire. Okay. With that, Your Honor, we would simply— Just one quick question. Is the conspiracy a 371 conspiracy? Correct. It was a 371 conspiracy to commit arson and mail fraud, and that's why this argument obviously is foreclosed on Mr. Anderson because he was convicted of mail fraud and the conspiracy to commit mail fraud, and also the use of fire and furtherance of the mail fraud, which Mr. Sorrentino and Mr. Peixoto were not. If there's no further questions, we'd respectfully request that you uphold the verdicts in this court and the judgment of the district court. Thank you. Very well. I'm looking at the three of you, and you look like you're all anxious to want to get up and say something, and so we're going to extend to each of you five minutes, and you can do it in the order in which you desire, and you've got to stay with the arguments that were made here by the U.S. Attorney's Office. So I'll leave it up to you as to who wants to go first. Your Honor, to clarify, that would be five minutes just among us? Five minutes per person alive and talking, yes. Can we take a vote on that? Your Honor, I would, first of all, thank you for extending the rebuttal time. I would like to address the issue of whether the severance matter was adequately preserved. I think if Your Honors look at the record, you will see that a motion was filed before trial, and then the issue was raised repeatedly throughout trial. Mr. Hobbs continued to renew the request for severance. Your Honors, as lawyers ---- Doesn't the basis have to be raised to be preserved? I mean, you have to make specific objections, not just general objections. Your Honors, that's actually my very next point. It sort of got me mid-word there. First of all, we don't think the case law supports a need to slice and dice issue preservation so finely, and we do address that in our reply brief. As all of you know, when you are writing motions prior to trial, you don't know what all of the evidence is going to be. You don't know every remark of opposing counsel that might be made, either in opening or certainly in closing. You don't know exactly what the witness's testimony is going to be, and so you have to anticipate based on the discovery. And in this case, I think we've seen that there was at least one witness who was disclosed, a very important witness, just prior to trial. So with the information that he had, Mr. Hobbs did the very best job he could and was as comprehensive as possible. Indeed, he did raise the off-cited case of Zaffiro v. United States for the proposition that prejudice arises in situations where evidence the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant. And we cited the particular docket entry where that was discussed. And so I think the citation of Zaffiro, which is kind of one of the leading cases, as you all well know, encompasses this. I mean, he did not know, nor could anyone, what Jennifer Sorrentino was going to testify to or that, for instance, Mr. Piconi would appear to be belligerent on the stand or what some of the defense witnesses that were called by the co-defendants were going to say or that there would be these repeated references to their world. As contrasted with the world of these other nice people, we're going to smear this world. And Mr. Anderson has been smeared by association with it because he was seen meeting with that individual who was on the tape. So I could find absolutely no requirement in the case law that required that kind of precise issue preservation. You'd, in essence, have to know what the testimony is ahead of time to be able to read people's minds. In any event, Your Honors, I respectfully refer you to pages 1 through 4 of our reply brief. With respect to the Jennifer Sorrentino issue, which obviously has been a matter of some interest with Your Honors, that is something that has been argued very forcefully by counsel for one of the co-defendants, and a great many questions have been answered. Although Ms. Sorrentino's testimony did not go to my client, there have been, as we discussed, references to the kind of world these other people came from and how Ms. Sorrentino used to be part of that world but is no longer a part of that world. If she were not in the case, my client's situation undoubtedly would have been vastly improved at trial. I mean, she prejudiced all three of the defendants. And just looking at the case on paper, the charged conspiracy is not just that Mr. Anderson did this with two unknown individuals. He did it with Vince Pachauda and Mark Sorrentino. And so if the case against them is infirm or falls apart in any way, that means that the conspiracy that is charged falls apart, Your Honors. No questions? Okay. With respect to the double jeopardy issue, I believe that that has been addressed at length by co-defendants' counsel, but we would ask that Your Honors also specifically consider that issue with regard to Mr. Anderson. We know he is situated differently, but in fact, there appears to have been cumulative punishment here. As Judge Grunder pointed out, the statute provides for two different punishments. Is it your client's argument, though, foreclosed by IMO? Your Honor, I'm not going to disagree. That is certainly hurt by that case. And indeed, you all might decide that it is foreclosed by that case. But we would certainly like to preserve the issue. That's why we noted it in the brief, because we may seek en banc review on that or even assert review at some later date. Thank you, Your Honors. Thank you very much, Ms. Pilot. We will next hear from Mr. Fowler. Mr. Fowler. Yes, Your Honors, thank you. I think I'd agree that there is a split in the circuit, just the way they look at things in this issue. Do you think there's already a split? I think there is. And I can't recall which case, but there are. We don't have a case where it's just arson in the enhancement or even arson and conspiracy in the enhancement. So if that's what the other circuits are worried about, then why would you say there's a conflict? I think there are cases, I'm sorry, with the conspiracy to commit arson and use of fire in connection therewith. I do think there are some of those, yes. From other circuits? Yes, and in fact, the Shriver case, I'm sorry, that was a mail fraud. You think the Fifth Circuit has said you cannot add the 10-year enhancement on top of a conspiracy to commit arson? I guess we'll just have to read the cases. I'm sorry, I tried to reread these cases and the ones that were in my head went away. It would not surprise me if those cases are out there, but they're . . . Well, it's an important question, since that's our case. But in any event, don't we have language in Shriver and Imud that would suggest that our courts at least said that the intent of Congress is clear? The Imud case has said that towards the end of the opinion, but I looked at that opinion and it does not address what the punishment was. It does say that, but looking at the case, I can't tell that there was any consecutive punishment there between the arson and the use of fire, like here, where we had . . . just because of that, where we're being double punished for the arson and the use of fire in connection with the arson. And this is absolutely the same offense. And can you look at the conspiracy to commit arson and the arson together? There's no way the jury could convict on those two and not have absolutely a use of fire conviction. And so, he is being punished for the same thing twice. The arson alleged in count two, I mentioned it, same date, same acts, same fire, same . . . The finding by the jury in count one is dead on. It says . . . it discusses that fire. But the question is, what did Congress intend? If Congress intends that he be punished twice, then I think that's the end of the story, right? And I don't think any court has looked at it and said it's clear one way or the other. I've read . . . I think the legislative intent was cited in Mr. Sorrentino's brief or referenced. It's been referenced in some of the cases. The cases that I've seen, there have been some that said, hey, Congress couldn't have intended that. It's more of a kind of a common sense. That would be the Seventh Circuit case, the Corona. There's a Konopka case, drawing a blank on the circuit on that, where they say, you just . . . Congress cannot have intended that. But I have not seen any case in all of them that were cited in any of the briefs where they say they believe Congress did intend separate punishment. That I recall seeing. But the Imoud case, again, there's no separate punishment at least set out in that opinion. And the Shriver case deals . . . has a mail fraud and a use of fire, not the exact situation we have. But if you look at the indictment and you read the paragraphs 1 through 11 in the conspiracy, which are incorporated by reference, as realleged in count 2, it's the exact same . . . There is no way you can look at that and say he's not being punished twice for the same offense. And to say that Congress intended that, there's no evidence to support that. And there are cases, flatly, that say that it cannot support it. And we've cited those and I think the government cited them as well. Any other questions? Thank you very much, Mr. Fowler. We will now hear from Mr. Petla. Thank you very much for indulging me. I would submit that it's a little disingenuous for the government to suggest that we should have got the phone records during the trial in the brief span of . . . you know, after we knew what Ms. Sorrentino . . . number one, that she was going to testify, and number two, what she was going to testify to. Well, isn't the question diligence? In other words, wasn't there . . . shouldn't there . . . as you were able to get the card from the casino, why wasn't there an attempt to go ahead and get the phone records, issue a subpoena, and then maybe request some time or request that the court expedited or something along those lines? Number one, it took a Herculean effort for a sole practitioner to get the casino records. Number two, we didn't know whether there would be phone records. There was never a moment where I could look at Judge Case and say, Judge, if you delay this case, there's going to be a phone record from four years ago, which is going to be exculpatory in nature. My client had no idea of that. During the trial itself, according to Mr. Becker, Mr. Michelson's co-counsel, the government hid Ms. Sorrentino's identity and they hid the nature of her testimony because it was singular. They did an effective job of that. They knew that if they revealed what she was going to say, then we would put together who it was. My client would put together who it was. So as it turns out, I knew 72 hours before, and that would have been Monday when I received the reports, I do recall that I didn't study those records that night because I had a lot on my . . . that I was getting ready to for Tuesday. She was going to testify on Thursday. And Mr. Michelson advised the court that morning before opening statement that the nature of her testimony would be identification. I asked, why with the protective order can't we know before opening statement? If we're under this order that we can't tell our clients anyway, why can't we know at the beginning of the day? And he said, in response, because Judge Case says, well, that makes sense, why not? And Mr. Michelson said, Judge, number one, they don't need to know because the substance of the surprise witness's testimony is identification. And that's in the record before the opening statements. But the government succeeded in withholding her identity. And the government decided it is their right not to identify her as a witness until during trial. I had witnesses that were endorsed, but those witnesses were intended to . . . they all knew Mr. Sorrentino. I'm sorry. Did you receive JANKS Act material? Monday at 4 o'clock p.m. Monday of trial at 4 o'clock p.m. And I assume there were some involving her statements, right? Yes, absolutely. And so I was able to discuss those things with my client on Wednesday, 24 hours before she testified on Thursday morning at 9 a.m. That was the protective order. And so that night, when I'm . . . Even though you had the materials, you couldn't talk to the client until Wednesday? That's right. And so what I'm submitting is that the government took a risk that if she was not telling the truth or if there was exculpatory evidence out there, that the defense could not get those materials before trial. And the government, I can assure you, was shocked when I cross-examined Ms. Sorrentino and I said to her at some point, isn't it true that everything you've just told this jury is not what happened that night? And when we walked forward and the government asked for my good faith basis for talking about the fact that she might have very well been at the 7th Street Casino from 9 o'clock or 9.30 that night until 1.40 in the morning, which is when the player's card was pulled out of the last machine. And I, at that point, advised them that the records will reveal that, the player's card records, and the government said, well, then we're entitled to those records. And I said, you'll get them as soon as we get them. They're on their way across the bridge. And so getting phone records from several states away from, you know, a business that's only open until 5 o'clock p.m. When I don't know for one, the first response to the subpoena that I sent was, no records exist because I had the subscriber name wrong. So no records exist for that subscriber. What evidence is there that it was her phone? She would have testified that the government had her phone record. I mean, the government had phone records of my client, which I think confirmed her phone number. But certainly my client could have testified to that. I believe she would have conceded that on cross-examination, that that was the phone she used. Thank you all. Very well. I will have to say the cases have been well presented thus far, and we will take it under consideration and render a decision for you all to take a good look at in due time. And I'm sorry right now because of our schedules, we can't tell you what due time is. And I know lawyers really rely on due time. So with that, we'll close this record. And we appreciate your attendance here today, and you'll be hearing from us. Thank you.